In the Matter of the MARRIAGE OF Michael EILERS and Patricia Eilers

and

In the Interest of L.S.E., R.W.E. and J.M.M., Children.

No. 10–05–00290–CV.

Court of Appeals of Texas, Waco.

Aug. 30, 2006.

Jana L. Foreman, and Channa E. Borman, C.E. Borman & Associates, College Station, for Appellant/Relator.

Bryan F. Russ, Jr., Palmos Russ McCullough & Russ LLP, Hearne, for Appellee/Respondent.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

As part of Michael and Patricia Eilerses' divorce decree, the trial court ordered Michael to pay child support and spousal maintenance. Michael contends in two issues that the court abused its discretion by: (1) ordering him to pay child support for a child with whom he has no parent-child relationship; and (2) ordering him to pay spousal maintenance because there is no evidence to overcome the statutory presumption against such an award. We will affirm.

The Eilerses married in 1984. Two children were born to the marriage. In 2002, they lived in Arizona where Michael had temporary employment. While there, they took custody of a child, J.M.M, who is not their biological child. J.M.M.'s mother and the Eilerses signed a notarized "Power of Attorney Delegating Parental Authority." By this power of attorney, J.M.M.'s mother purported to grant to the Eilerses "the following powers, authorities and consents:"

1. Grantor consents to the temporary custody of said Child by the custodian for the period and purpose as follows:

For the period of time until legal adoption of said Child is complete or until January 4, 2012, whereas Child will reach age 18.

For purpose of rearing said Child.

2. Grantor authorized [sic] the Custodian to do and undertake all acts responsible and necessary to protect the best interests and welfare of the Child while

under the care of the Custodian. Without limiting the generality of the foregoing, the Custodian is further authorized to provide emergency and general medical care which the Custodian in his or her discretion deems necessary or advisable for any illness or injury sustained by the Child during this temporary custody.

3. Grantor consents to any reasonable discipline imposed upon Child by the Guardian provided that said discipline does not constitute unreasonable abuse.

4. Grantor consents to the Custodian to be fully responsible for all matters of financial importance in regards to said Child including sustenance, health-care and all matters of the well-being of said Child.

5. Grantor does hereby authorize said Custodian to have rights to*or possession of said Child's medical records, charts, files, prognoses, reports, X-rays, laboratory reports, clinical records, immunizations records, and such other information relative to said Child's medical condition.

6. Grantor does hereby authorize the Custodian to have rights to*or possession of said Child's educational records, the Custodian is further authorized to provide education for said Child which said Custodian in his or her discretion deems necessary during this time.

Patricia initiated the underlying divorce proceeding. She identified J.M.M. in her original petition as a child of the marriage, no different than the Eilerses' biological children, and requested among other things that the parties be appointed joint managing conservators, that Michael pay child support, and that Michael pay spousal maintenance. Michael filed a counter-petition in which he too identified J.M.M. as a child of the marriage. The court ordered the payment of temporary child support for all three children and signed an order withholding child support from Michael's earnings.

Shortly before trial, Michael filed an amended counter-petition specifically denying paternity of J.M.M. Patricia responded with an amended divorce petition, adding alternative allegations that J.M.M. was "equitably adopted" by the Eilerses and that Michael "contractually agreed" to pay child support for J.M.M.

Following a bench trial, the court ordered Michael to pay child support for the three children in the amount of $1,321.65 per month and spousal maintenance in the amount of $660.00 per month.

## Standard of Review

■ Because no findings of fact were requested or made, we must presume that the court made all findings necessary to support its judgment, and the judgment must be affirmed if it can be upheld on any legal theory supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990) (per curiam); *Yarbrough v. Yarbrough*, 151 S.W.3d 687, 690 (Tex.App.-Waco 2004, no pet.); *Treadway v. Shanks*, 110 S.W.3d 1, 5 (Tex.App.-Dallas 2000), *aff'd*, 110 S.W.3d 444 (Tex.2003).

■ We review a child support order under an abuse-of-discretion standard. *Worford*, 801 S.W.2d at 109; *In re J.C.K.*, 143 S.W.3d 131, 134 (Tex.App.-Waco 2004, no pet.). We do not conduct an independent review of findings of fact in such a case under traditional legal and factual sufficiency standards. *Yarbrough*, 151 S.W.3d at 690; *J.C.K.*, 143 S.W.3d at 135. Rather, legal and factual sufficiency are factors which can be considered in determining whether an abuse of discretion has occurred. *Id.*

■ The same standard of review applies to an award of spousal maintenance

as applies to a child support award. *See Yarbrough,* 151 S.W.3d at 690.

## Equitable Adoption

■ Michael contends in his first issue that the court abused its discretion by ordering him to pay child support for J.M.M. because he has no parent-child relationship with J.M.M.

Patricia first responds that no abuse of discretion is shown because Michael is liable for child support under a theory of equitable adoption. However, Texas courts have consistently rejected the application of equitable adoption in cases involving child custody or child support. *See* James W. Paulsen, *Family Law: Parent and Child,* 54 S.M.U. L. REV. 1417, 1473–75 (2001).

> The descriptive phrases, "equitable adoption," "adoption by estoppel," and "adoptive status," are used in decided cases strictly as a shorthand method of saying that because of the promises, acts and conduct of an intestate deceased, those claiming under and through him are estopped to assert that a child was not legally adopted or did not occupy the status of an adopted child. Analysis of the cited cases makes clear that we did not intend to hold, and did not hold, that "equitable adoption" or "adoption by estoppel" is the same as legal adoption or that it has all of the legal consequences of a statutory adoption.

*Heien v. Crabtree,* 369 S.W.2d 28, 30 (Tex. 1963) (citation omitted) (quoted by *In re M.L.P.J.,* 16 S.W.3d 45, 47 (Tex.App.-Eastland 2000, pet. denied); *T.W.E. v. K.M.E.,*

828 S.W.2d 806, 809 (Tex.App.-San Antonio 1992, no writ)).[1]

Thus, Texas courts have held that a person may not be awarded managing conservatorship of a child under a theory of equitable adoption. *See Trevino v. Garcia,* 627 S.W.2d 147, 148–49 (Tex.1982) (orig. proceeding); *T.W.E.,* 828 S.W.2d at 809. One court has similarly concluded that a person may not be ordered to pay child support under a theory of equitable adoption. *See M.L.P.J.,* 16 S.W.3d at 48

Accordingly, we hold that Michael may not be compelled to pay child support for J.M.M. under a theory of equitable adoption.

## Implied Contract

■ Patricia next contends that Michael is liable for child support under an implied contract.

> [A]n implied contract can arise from the acts and conduct of the parties. Such a contract exists when the facts and circumstances surrounding the parties' relationship imply a mutual intention to contract. Every contract requires a meeting of the minds, but the meeting can be implied from and evidenced by the parties' conduct and course of dealing.

*Harrison v. Williams Dental Group, P.C.,* 140 S.W.3d 912, 916 (Tex.App.-Dallas 2004, no pet.) (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972)); *accord Double Diamond, Inc. v. Hilco Elec. Coop., Inc.,* 127 S.W.3d 260, 267 (Tex.App.-Waco 2003, no pet.); *Fraud-Tech, Inc. v.*

---

1. Texas courts regularly employ the doctrine of equitable adoption in probate matters. *See, e.g., Spiers v. Maples,* 970 S.W.2d 166, 170–72 (Tex.App.-Fort Worth 1998, no pet.); *Luna v. Estate of Rodriguez,* 906 S.W.2d 576, 579–81 (Tex.App.-Austin 1995, no writ); *see also* Edward W. Bailey, *Adoption "By Estop-* pel," 36 Tex. L.Rev. 30 (1957). In fact, the Probate Code expressly defines a "child" to include one who has been adopted "by acts of estoppel." Tex. Prob.Code Ann. § 3(b) (Vernon 2003). The Family Code does not have a comparable provision, however.

*Choicepoint, Inc.,* 102 S.W.3d 366, 385–86 & nn. 68–69 (Tex.App.-Fort Worth 2003, pet. denied).

The Supreme Court in *Haws & Garrett* looked to the Restatement and Professor Williston's treatise on Contracts in discussing how a mutual agreement can be "inferred from the circumstances." 480 S.W.2d at 609.

> The Restatement speaks to the matter of assent as "(1) the manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by a failure to act. (2) the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." RE-STATEMENT (SECOND) OF CONTRACTS § 21 (Tent. Draft No. 1, 1964). It is said in the Williston Treatise that " ... The modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances. ... And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such." 1 S. WILLISTON, CONTRACTS § 22A (1957). An inference is but a deduction which the trier of fact makes from the facts proved, the drawing of which is essentially the exercise of a fact finding function.

*Haws & Garrett,* 480 S.W.2d at 609–10.

Although the Supreme Court identified the pertinent provision of the Restatement as section 21 in the tentative draft then available, this provision ultimately appeared as section 19 of the Restatement (Second) of Contracts. Section 19 provides:

> (1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.
>
> (2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.
>
> (3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.

RESTATEMENT (SECOND) OF CONTRACTS § 19 (1981). The Fifth Circuit and the First Court of Appeals have both expressly relied on this provision in decisions involving contract formation. *See Hollywood Fantasy Corp. v. Gabor,* 151 F.3d 203, 210–11 (5th Cir.1998); *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1291–93 (5th Cir.1994); *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 818 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.).

The current edition of the Williston treatise continues to treat this issue in the same manner as the 1957 edition cited by the Supreme Court. The current treatise provides in pertinent part:

> [T]he modern law properly construes both acts and words as having the meaning which a reasonable person present would ascribe to them in view of the surrounding circumstances. Thus, a bilateral agreement may be found even though one of the promises is inferred from conduct rather than from words. Even where words are used, the contract of the parties will ordinarily be held to embrace not only what they have said, but also what is necessarily implied from what they said. And, broadly speaking, any conduct of one party, from

which the other may reasonably draw the inference of a promise, is effective in law as such a promise.

1 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 4:2 (4th ed.1990) (footnotes omitted).

■ Generally, a child support obligation is imposed by court order under Chapter 154 of the Family Code. *See* TEX. FAM. CODE ANN. § 154.001(a) (Vernon Supp.2006) ("court *may* order" parent to pay child support) (emphasis added). However, a person may also contract to pay child support. *See Ex parte Hall,* 854 S.W.2d 656, 658 (Tex.1993) (orig.proceeding); *In re Johnson,* 150 S.W.3d 267, 269–70 (Tex.App.-Beaumont 2004, orig. proceeding); *see also Hollander v. Capon,* 853 S.W.2d 723, 724 (Tex.App.-Houston [1st Dist.] 1993, writ denied); *cf.* TEX. FAM. CODE ANN. § 154.124(a) (Vernon Supp. 2006) (permitting written child support agreement "[t]o promote the amicable settlement" of suit).

■ Regarding Patricia's implied contract theory, Michael contends that the power of attorney executed by J.M.M.'s biological mother imposes no legal obligation on him because this document is void as against public policy and because there is no evidence of acceptance on his part of financial responsibility for J.M.M.

Michael is correct in saying that such "agreements" have been held void in Texas as against public policy. *See Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1118 (1921); *Kohls v. Kohls,* 461 S.W.2d 455, 461–62 (Tex.Civ.App.-Corpus Christi 1970, writ ref'd n.r.e.). After Hooks however, the Supreme Court soon recognized that such agreements cannot be against public policy because statutes in effect for a century have permitted parents to execute documents transferring custody of their children to other adults or to institutions. *See Cheney v. Coffey,* 131 Tex. 212, 113 S.W.2d 162, 164–65 (1938); Edward W. Bailey, *Adoption "By Estoppel,"* 36 TEX. L. REV. 30, 33–36 & nn. 16–21 (1957); *see also* Act approved March 26, 1907, 30th Leg., R.S., ch. 77, § 1, 1907 Tex. Gen. Laws 103, 103.[2]

In more recent times, the Family Code has expressly authorized a parent to execute an "affidavit for voluntary relinquishment of parental rights" regardless of whether an adoptive parent has been iden-

---

2. This enactment, codified as article 2a of the Revised Civil Statutes of 1895, provided in pertinent part:

The parent or parents of any child who is to be adopted as provided in Articles 1 and 2 of this title, may, by an instrument in writing, duly signed and authenticated or acknowledged as deeds are required to be, transfer their parental authority and custody over said child so adopted to the party so adopting such child, and after the execution of such an instrument of writing duly acknowledged or authenticated as aforesaid, they shall thereafter be barred from exercising any authority, control or custody over said child as against the party so adopting him; and the child or children so adopted shall have the same rights as against the person or persons adopting said child or children for support and maintenance, and for proper and humane treatment, as a child has, by law, against lawful parents; provided, however, that it shall be unlawful for any person adopting any children under this act to transfer his authority and custody to any other person; provided further, that nothing in this article shall prevent a court of competent jurisdiction from taking away from such adoptive parents the custody of the adoptive child and awarding the same to its natural parents, or either of them, or to any other person, upon proof of the bad moral character of such adoptive parents or upon proof of abuse, neglect, or ill treatment of such adopted child by the adoptive parent.

Act approved March 26, 1907, 30th Leg., R.S., ch.77, § 1, 1907 Tex. Gen. Laws 103, 103.

tified.[3] *See* TEX. FAM. CODE ANN. § 161.103 (Vernon Supp.2006). Under the current version of section 161.103, a parent voluntarily relinquishing his or her parental rights by affidavit must, among other things, designate "a prospective adoptive parent, the Department of Protective and Regulatory Services, if the department has consented in writing to the designation, or a licensed child-placing agency to serve as managing conservator of the child." *Id.* § 161.103(b)(12).[4]

Because a parent is permitted by statute to execute a document relinquishing her parental rights, we must reject Michael's contention that the power of attorney in question is void as against public policy. *See Cheney*, 113 S.W.2d at 164–65; *Bailey*, 36 TEX. L. REV. at 33–36 & nn. 16–21.

█ Michael next contends that there is no evidence of acceptance on his part of financial responsibility for J.M.M. However, Michael's acceptance of such responsibility may be inferred from his acts and from the surrounding facts and circumstances. *See Haws & Garrett*, 480 S.W.2d at 609–10; *Harrison*, 140 S.W.3d at 916; *Double Diamond*, 127 S.W.3d at 267; *Fraud–Tech*, 102 S.W.3d at 385–86 & nn. 68–69; *see also Hollywood Fantasy Corp.*, 151 F.3d at 210–11; *Karl Rove & Co.*, 39 F.3d at 1291–93; *Texaco*, 729 S.W.2d at 818; RESTATEMENT (SECOND) OF CONTRACTS § 19; WILLISTON & LORD § 4:2.

Here, J.M.M.'s biological mother executed a power of attorney granting to the Eilerses full responsibility for J.M.M.'s "sustenance, health-care and all matters of [his] well-being." The Eilerses signed this document as "custodians," took custody of J.M.M., and treated him as their son from that point forward. Michael agreed that he had signed this document indicating that he was to be financially responsible for J.M.M. Patricia testified that Michael and she agreed to be financially responsible for J.M.M and that they "would financially support [him] until he became of age."

█ A contractual child support obligation over and above a child support obligation imposed by law is considered a contractual debt. *See Hall*, 854 S.W.2d at 658; *Johnson*, 150 S.W.3d at 269–70. To recover a contractual debt, a plaintiff must establish: (1) the existence of the debt; (2) that the defendant agreed to be liable for the debt; (3) that the plaintiff is authorized to collect the debt; and (4) the balance due and owing on the debt. *Cf. Doncaster v. Hernaiz*, 161 S.W.3d 594, 602 (Tex.App.-San Antonio 2005, no pet.) (dis-

---

**3.** In fact, such a procedure was apparently first codified in 1951 as an amendment to article 46a, § 6 of the Revised Civil Statutes of 1925. The 1951 amendment provided in pertinent part:

> In the case of a child placed by its parents in a child-placing agency or institution licensed by the State Department of Public Welfare to place children for adoption, it shall be sufficient for the living parents to consent in writing that such agency or institution place such child for adoption, and no further consent shall be required of such living parent.

Act of May 7, 1951, 52d Leg., R.S., ch. 249, § 2, 1951 Tex. Gen. Laws 388, 389–90 (re-pealed 1973). In 1973, the Texas Legislature enacted the Texas Family Code, providing for the first time for an "affidavit for voluntary relinquishment of parental rights." Act of May 25, 1973, 63d Leg., R.S., ch. 543, § 1, sec. 15.03, 1973 Tex. Gen. Laws 1411, 1427–28 (amended 1975).

**4.** Before 1997 however, the requirement that an affidavit of relinquishment designate a prospective adoptive parent or agency was not mandatory. *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 161.103(c)(1), 1995 Tex. Gen. Laws 113, 214–15 (amended 1997) (current version at Tex. Fam.Code Ann. § 161.103(b)(12) (Vernon Supp.2006)).

cussing elements for suit on note); *Scott v. Commercial Servs. of Perry, Inc.,* 121 S.W.3d 26, 29 (Tex.App.-Tyler 2003, pet. denied) (same).[5]

Here, the power of attorney jointly executed by J.M.M.'s biological mother and the Eilerses and the Eilerses' testimony constitute evidence that the Eilerses (collectively and individually) agreed to provide for J.M.M.'s financial support. Patricia established her right to enforce this contractual obligation either by her status as managing conservator or as next friend for J.M.M. However, this implied child support contract is vague regarding the amount to be paid.

■■■ When a contract is silent or ambiguous as to a particular term, a court may supply a reasonable term to effectuate the parties' agreement if all other terms of the contract are clear and definite. *See KW Constr. v. Stephens & Sons Concrete Contractors, Inc.,* 165 S.W.3d 874, 883–84 (Tex.App.-Texarkana 2005, pet. denied); *Lidawi v. Progressive County Mut. Ins. Co.,* 112 S.W.3d 725, 731–32 (Tex.App.-Houston [14th Dist.] 2003, no pet); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981).[6] Thus, a court may, for example, supply a reasonable price if the contract is silent or ambiguous as to this term. *See KW Constr.,* 165 S.W.3d at 883–84; *Buxani v. Nussbaum,* 940 S.W.2d 350, 353 (Tex.App.-San Antonio 1997, no writ).

The child support guidelines provided by the Legislature are "presumed to be reasonable." TEX. FAM. CODE ANN. § 154.122(a) (Vernon 2002). The court ordered Michael to pay the amount of child support established by these guidelines. Therefore, we cannot say that the court abused its discretion by finding the existence of a child support contract for J.M.M. and by ordering Michael to pay the amount of support required by the child support guidelines to fulfill his obligations under this contract.

■■■ Although the court properly awarded child support for J.M.M. under a contractual theory, the judgment erroneously reflects that Michael's child support obligation for J.M.M. is the same as for his biological children. Because his child support obligation for J.M.M. is a contractual obligation enforceable as a debt, it must be identified in the judgment as such. Therefore, we will modify the judgment to reflect that J.M.M.'s portion of child support is contractual rather than statutory. *See* TEX. R. APP. P. 43.2(b); *De La Garza v. Express–News Corp.,* 722 S.W.2d 251, 253 (Tex.App.-San Antonio 1986, no writ); *see also Morris v. Morris,* 894 S.W.2d 859, 864 (Tex.App.-Fort Worth 1995, no writ).

The judgment requires Michael to pay thirty percent of his net monthly resources ($1,321.65) as child support for L.S.E., R.W.E., and J.M.M. To make Michael's *statutory* support obligation apply to only L.S.E. and R.W.E., we will modify the judgment to reflect that Michael will pay

---

5. The traditional elements for a suit on a note are: (1) the existence of the note; (2) that that the defendant had signed the note; (3) that the plaintiff was the holder of the note; and (4) that a balance was due and owing under the note. *See Doncaster v. Hernaiz,* 161 S.W.3d 594, 602 (Tex.App.-San Antonio 2005, no pet.); *Scott v. Commercial Servs. of Perry, Inc.,* 121 S.W.3d 26, 29 (Tex.App.-Tyler 2003, pet. denied).

6. Section 204 provides:

When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Restatement (Second) of Contracts § 204 (1981).

twenty-five percent of his net monthly resources ($1,101.37) as child support for L.S.E. and R.W.E. and, when Michael's duty of support terminates as to one of them under section 154.006 of the Family Code, then Michael's statutory support obligation will be twenty percent of his net monthly resources ($881.10). *See* TEX. FAM. CODE ANN. § 154.006 (Vernon Supp.2006), §§ 154.125, 154.127 (Vernon 2002).

We will further modify the judgment to reflect a finding that Michael has a contractual child support obligation for J.M.M. in the amount of $220.28 per month which will continue in the words of the parties' agreement "until January 4, 2012, whereas [J.M.M.] will reach age 18."

Because we are affirming the award of child support for J.M.M., we overrule Michael's first issue.

## Spousal Maintenance

Michael contends in his second issue that the court abused its discretion by ordering him to pay spousal maintenance because there is no evidence to overcome the statutory presumption against such an award.

Section 8.053 of the Family Code provides a statutory presumption that spousal maintenance "is not warranted unless the spouse seeking maintenance has exercised diligence in:

(1) seeking suitable employment; or

(2) developing the necessary skills to become self-supporting during a period of separation and during the time the suit for dissolution of the marriage is pending."

TEX. FAM. CODE ANN. § 8.053(a) (Vernon 2006).

Here, Patricia has only a high-school education. Michael and she both testified that her primary responsibilities during their twenty years of marriage were to be a homemaker and raise their children. After their separation, she secured a low-paying job in a grocery store which barely covers the monthly rent. Her van was repossessed because she was unable to make the monthly payments. This lack of transportation and her child-rearing responsibilities have prevented her from being able to pursue job training. She has explored other jobs in the vicinity but has been unable to find a better-paying job.

From this evidence, we cannot say that the court abused its discretion by concluding that Patricia overcame the statutory presumption against spousal maintenance because she provided ample evidence that she has exercised diligence in seeking suitable employment under her circumstances. *See* TEX. FAM. CODE ANN. § 8.053(a)(1); *Alexander v. Alexander*, 982 S.W.2d 116, 118–19 (Tex.App.-Houston [1st Dist.] 1998, no pet.); *see also In re Marriage of McFarland*, 176 S.W.3d 650, 657–59 (Tex.App.-Texarkana 2005, no pet.); *Lopez v. Lopez*, 55 S.W.3d 194, 198–99 (Tex.App.-Corpus Christi 2001, no pet.). Thus, we overrule Michael's second issue.

## Conclusion

The court properly awarded child support for J.M.M. as a contractual obligation. However, the judgment does not reflect that this portion of the court's child support award is contractual rather than statutory. Therefore, we modify the judgment to reflect that Michael will pay $1,101.37 as monthly child support for L.S.E. and R.W.E. and, when Michael's duty of support terminates as to one of them under section 154.006 of the Family Code, then Michael's statutory support obligation will be $881.10 per month. We further modify the judgment to reflect that Michael has a contractual child support obligation for J.M.M. in the amount of

$220.28 per month which will continue until January 4, 2012.

We affirm the judgment as modified.

Chief Justice GRAY concurring and dissenting.

TOM GRAY, Chief Justice, concurring and dissenting.

Someday, but apparently not today, we will quit re-lawyering cases for the parties. Michael's first issue does not seek reformation to reflect the child support as contractual support rather than that which can be ordered for a legally recognized child of the payee of child support. I try to avoid deciding issues the parties have not presented or granting relief not requested. Thus, I concur in much of the opinion and judgment of the Court, but not the portion in which the Court goes off on its detour, reforming the judgment in a manner not presented to us for disposition, nor asked for as relief and, therefore, must dissent from those portions.